# NO. 12-13-00201-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST* | *§* | *APPEAL FROM THE 3RD* |
| *OF L. K.,* | *§* | *JUDICIAL DISTRICT COURT* |
| *A CHILD* | *§* | *HOUSTON COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

F.T. appeals the termination of her parental rights. In eight issues, F.T. challenges the order of termination. We affirm.

## BACKGROUND

F.T. is the mother of L.K., born January 1, 2010. J.K.[1] is the father of L.K. and is not a party to this appeal. On June 25, 2012, the Department of Family and Protective Services (the Department) filed an original petition for protection of L.K., for conservatorship, and for termination of F.T.'s parental rights. The Department was appointed temporary managing conservator of L.K., and F.T. and J.K. were appointed temporary possessory conservators.

At the conclusion of the trial on the merits, the jury found, by clear and convincing evidence, that the parent-child relationship between F.T. and L.K. should be terminated. The trial court found, by clear and convincing evidence and based on the jury's findings, that F.T. had engaged in one or more of the acts or omissions necessary to support termination of her parental rights. The trial court also found that termination of the parent-child relationship between F.T.

---

[1] J.K. signed an unrevoked or irrevocable affidavit of voluntary relinquishment of parental rights to the Texas Department of Family and Protective Services. Accordingly, the trial court ordered the termination of his parent-child relationship with L.K.

and L.K. was in the child's best interest. Based on these findings, the trial court ordered that the parent-child relationship between F.T. and L.K. be terminated. This appeal followed.

## TERMINATION OF PARENTAL RIGHTS

Involuntary termination of parental rights embodies fundamental constitutional rights. *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.–Texarkana 1995, writ denied). Because a termination action "permanently sunders" the bonds between a parent and child, the proceedings must be strictly scrutinized. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.–El Paso 1998, no pet.).

Section 161.001 of the family code permits a court to order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2013); *In re J.M.T.*, 39 S.W.3d 234, 237 (Tex. App.–Waco 1999, no pet.). First, the parent must have engaged in any one of the acts or omissions itemized in the first subsection of the statute. TEX. FAM. CODE ANN. § 161.001(1) (West Supp. 2013); *Green v. Texas Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.–El Paso 2000, no pet.); *In re J.M.T.*, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(2) (West Supp. 2013); *In re J.M.T.*, 39 S.W.3d at 237. Both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351; *In re J.M.T.*, 39 S.W.3d at 237.

The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM. CODE ANN. § 161.001; *In re J.J.*, 911 S.W.2d at 439. Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2008). The burden of proof is upon the party seeking the deprivation of parental rights. *In re J.M.T.*, 39 S.W.3d at 240.

## STANDARD OF REVIEW

When confronted with both a legal and factual sufficiency challenge, an appellate court must first review the legal sufficiency of the evidence. *Glover v. Tex. Gen. Indem. Co.*, 619

2

S.W.2d 400, 401 (Tex. 1981); *In re M.D.S.*, 1 S.W.3d 190, 197 (Tex. App.–Amarillo 1999, no pet.). In conducting a legal sufficiency review, we must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. *Id*.

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the fact finder has met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id*. at 27-29. Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. The trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.–Houston [1st Dist.] 1997, pet. denied).

## TERMINATION UNDER SECTION 161.001(1)(E)

In her third and fourth issues, F.T. argues that the evidence is legally and factually insufficient to support a finding that she engaged in conduct, or knowingly placed L.K. with persons who engaged in conduct, that endangered L.K.'s physical or emotional well being.

**Applicable Law**

The court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangers the physical or emotional well being of the child. TEX. FAM. CODE ANN. § 161.001(1)(E) (West Supp. 2013). The specific danger to the child's well being need not be established as an independent proposition, but may instead be inferred from parental misconduct. *Tex. Dep't of Human Svcs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re J.J.*, 911 S.W.2d at 440. Scienter is not required for an appellant's own acts under Section 161.001(1)(E), although it is required when a parent places her child with others who

3

engage in endangering acts.  *In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).  Finally, the need for permanence is a paramount consideration for the child's present and future physical and emotional needs.  *In re N.K.*, 99 S.W.3d 295, 301 n.9 (Tex. App.—Texarkana 2003, no pet.); *In re M.D.S.*, 1 S.W.3d at 200.

"Endanger" means to expose to loss or injury or to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re D.M.*, 58 S.W.3d 801, 811 (Tex. App.—Fort Worth 2001, no pet.).  It is not necessary that the conduct be directed at the child or that the child actually suffers injury.  *Boyd*, 727 S.W.2d at 533; *In re J.J.*, 911 S.W.2d at 440.  Subsection (E) requires us to look at the parent's conduct alone, including actions, omissions, or the parent's failure to act.  *In re D.J.*, 100 S.W.3d 658, 662 (Tex. App.—Dallas 2003, pet. denied); *In re D.M.*, 58 S.W.3d at 811.  Termination under subsection (E) must be based on more than a single act or omission.  *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied).  A voluntary, deliberate, and conscious "course of conduct" by the parent that endangers the child's physical and emotional well being is required.  *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d at 634.

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well being of a child.  *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.); *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).  Conduct which routinely subjects a child to the probability that she will be left alone because the parent is once again jailed endangers both the physical and emotional well being of a child.  *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

Mental illness or incompetence of a parent alone is not a ground for terminating the parent-child relationship.  *In re C.M.B.*, 204 S.W.3d 886, 895 (Tex. App.—Dallas 2006, pet. denied).  However, if a parent's mental state causes her to engage in conduct which endangers the physical or emotional well being of a child, that conduct can be considered in a termination proceeding.  *Id.*; *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *In re T.C.*, No. 10-10-00207-CV, 2010 WL 4983512, at *3 (Tex. App.—Waco Dec. 1, 2010, pet. denied) (mem. op.).  A parent's history of delusional behavior, lack of insight into the severity of her mental health condition, and failure to properly seek treatment and take medication may constitute a course of conduct that endangers the physical and emotional well

4

being of a child. *L.F. v. Dep't of Family & Protective Svcs.*, Nos. 01-10-01148-CV, 01-10-01149-CV, 2012 WL 1564547, at \*10 (Tex. App.—Houston [1st Dist.] May 3, 2012, pet. denied) (mem. op.).

**<u>F.T.'s Behavior</u>**

The evidence shows that after L.K. was born, F.T.'s behavior changed. The manager of F.T.'s apartment complex stated that F.T. began acting irrationally and that her behavior disturbed other tenants. F.T.'s actions included digging holes, putting "graves" outside other tenants' apartments, asking if she could stay with other tenants, taking tenants' clothes from the laundry room, walking late at night and knocking on tenants' doors, and putting knives in the windows. Some of the tenants reported feeling threatened and unsafe. F.T. told the manager that people were in her apartment and coming out of the walls, and that snipers were at a nearby hotel. The apartment manager requested a mental health warrant because F.T. seemed paranoid.

A Crockett Police Department patrol officer met a Department investigator at F.T.'s house to serve her with the mental health warrant. The investigator testified that at about the same time, she had received allegations that F.T. was digging holes, eating dirt, and threatening to kill other tenants in her apartment complex. F.T. told the officer that she did not need help, but the investigator noticed holes in the front yard. L.K. was placed with family, and F.T. was admitted to a psychiatric hospital for five days.

Approximately ten days later, L.K. was returned to F.T. after she agreed to participate in safety based services with the Department, including parenting classes and counseling, taking her prescribed medications, and continuing to seek medical care. The investigator referred F.T. to family based safety services in early May 2012. F.T.'s family physician observed in May 2012 that F.T. seemed paranoid and delusional. She told him that people were after her and doing bad things to her. After F.T. was released from the hospital, the doctor prescribed Seroquel and Abilify for her, but testified that she stopped taking her medications after experiencing "weird dreams." F.T. also stated that she did not need the medications.

From June 2012 through February 2013, F.T did not take her prescribed medications and her behavior continued to deteriorate. As a result, her contact with law enforcement and the Department increased. First, F.T. and L.K. were discovered in a back closet of a house that was being renovated. The Department removed L.K. and placed her in foster care. Next, F.T. was found inside a laundry room in someone else's house. She was covered in dirt and mosquito

5

bites. F.T. told the homeowner's house sitter that someone bought the house for her. She also told the sitter that helicopters were after her and that someone was "putting voodoo" on her. A Crockett patrol officer who had arrived at the house saw F.T. run from the laundry room into the woods and called out her name. At that point, he said, F.T. laid down on the ground and began "playing with" dirt and leaves. During the officer's search, he discovered a "camp" area with bags inside a wooded area where he believed she slept. F.T. was arrested for criminal trespass for entering the two houses.

Another Crockett patrol officer discovered F.T. in the carport of a third house carrying a mop bucket and a broom, pretending to clean the walls of the carport. She told the officer she was meeting the homeowner later to rent the house. F.T. became defensive when confronted with the facts, using profanity and walking towards the officer. She had to be restrained and was arrested for criminal trespass of a habitation. Later, a pastor of a Crockett church noticed that F.T. had some of her belongings in an older part of the church and appeared to be living there. She also received a criminal trespass warning for entering the church.

L.K.'s family physician found her inside his office one weekend, and F.T. told him she had been there since the day before. She was disheveled, wearing "tattered" clothes, dirty, hungry, and thirsty. The physician testified that F.T. wrote him letters between May and June of 2012. In these letters, she addressed a variety of subjects including her love for him and her belief that he had been L.K.'s father since she was born. The physician stated that he was concerned for his wife, his children, and his staff. One of the Crockett patrol officers who had previously been in contact with F.T. testified that he received a call from a local day care center that F.T. was repeatedly approaching the building, looking around, and walking off. The officer issued a criminal trespass warning to F.T.

In February 2013, F.T. entered the commons area at Crocket High School and approached her older daughter, C.W. Surveillance from the school shows that her daughter "bolted out of there" when F.T. approached her. The principal testified that she had received a court order from C.W.'s father that prohibited F.T. from being around C.W. She requested that a criminal trespass warning be issued against F.T. At some point, F.T. was taken to the emergency room for drinking kerosene. F.T. told law enforcement that she accidentally picked up a cup of kerosene that she believed was water.

**F.T.'s Mental Health**

One of the Department investigators, a psychiatrist, and a psychologist testified regarding F.T.'s unstable mental health. During the first incident—when she was discovered in a closet — F.T. told the Department investigator that her house had been broken into, that she was running from helicopters that were chasing her, that people were chasing her and her child, and that she was running for her life. She also stated that her neighbor was her sister and was planning some kind of scheme. The investigator was unable to verify any of F.T.'s claims. F.T. called the investigator three days after the incident, said she wanted L.K. back, and repeated her stories about being chased by helicopters and running from "the cops and the law." She also claimed that her neighbor was her twin sister because they left their apartments at the same time and had the same mannerisms. F.T. accused her alleged twin sister of casting spells on her, and stated that God told her these spells were going to go away. The investigator believed F.T. was delusional.

In contrast to this testimony, one witness stated that F.T. had lived with him and his wife since March 2013. He stated that F.T. cleans the house and cooks. He denied that she dug holes in the yard, ate dirt, or acted out of the ordinary. He stated that in the twenty-two years he has known F.T., she has always been a good person and acted appropriately. However, he admitted not being in contact with F.T. from May 2012 to March 2013.

A psychologist stated that he conducted an evaluation of F.T. in August 2012. He diagnosed F.T. with anxiety disorder, depressive disorder, delusional disorder, borderline intelligence functioning, problems with primary group support and employment, and a low general affective functioning level. He recommended discovering what psychological factors influenced her physical symptoms, counseling, an emphasis on psychological change, and therapy to address weaknesses under stress. He was concerned about F.T.'s persecutory delusions or false beliefs, and believed they needed to be addressed. He also stated that she repressed and denied her psychological issues, thereby making it improbable that she would pursue effective treatment.

A board certified psychiatrist stated that he conducted a psychiatric evaluation of F.T. on October 31, 2012. He diagnosed F.T. with psychosis not otherwise specified, schizophrenia, or bipolar disorder. In their first session, F.T. refused medication because she did not believe she needed it. Later, she agreed to take medication, but did not return for a follow up in two weeks as requested. Consequently, the psychiatrist did not believe that she was taking her medication. He

7

stated that F.T. had significant psychiatric problems and recommended random drug screens and supervised visits with L.K.

**Conclusion**

Viewing the evidence in the light most favorable to the finding, we conclude the jury reasonably could have determined that F.T. did not recognize her mental health issues, refused to take her prescribed medications, was mentally unstable, had been arrested or cited numerous times for trespassing, and violated orders to stay away from her older daughter. She also had persistent delusions about her physician, a twin sister, "spirits," and being chased by people and helicopters, thereby putting herself and her daughter in danger when she sought shelter in another person's home. From this evidence, the jury could have determined that F.T.'s history of delusional behavior, lack of insight into her mental condition, and failure to properly seek treatment and take medication subjected L.K. to a life of uncertainty and instability that endangered her physical and emotional well being. *See* ***In re M.R.J.M.***, 280 S.W.3d at 503; ***L.F.***, 2012 WL 1564547, at \*10.

Although there is evidence that conflicts with the trial court's findings, this evidence is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that F.T. engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered her physical or emotional well being. Therefore, we hold that the evidence is legally and factually sufficient to support termination of F.T.'s parental rights under Section 161.001(1)(E). Accordingly, we overrule F.T.'s third and fourth issues regarding Section 161.001(1)(E).[2]

**BEST INTEREST OF THE CHILDREN**

In her seventh and eighth issues, K.S. argues that the evidence is legally and factually insufficient to support a finding that termination of her parental rights was in the best interest of the child. In determining the best interest of the child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in

---

[2] Under Section 161.001, the Department was required to prove only one ground of termination under subsection (1). Because we have concluded that the evidence is legally and factually sufficient to support termination of F.T.'s parental rights under subsection (1)(E), we need not determine if the trial court's findings under subsections (1)(D) and (1)(O) are also supported by legally and factually sufficient evidence. Therefore, we do not address F.T.'s remaining issues relating to the trial court's termination finding.

the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

This list is not exhaustive, but simply indicates considerations that have been or could be pertinent. *Id.* However, the best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors. *In re D.M.*, 58 S.W.3d at 814. The *Holley* test focuses on the best interest of the child, not the parent's best interest. *Dupree v. Texas Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). We apply the *Holley* factors below.

## Analysis

In addition to the testimony discussed above, the evidence included testimony from the manager of F.T.'s apartment complex that F.T. had lived in one of the apartments for approximately fourteen years. The manager inspected F.T.'s apartment every ninety days, and stated that her apartment was very cluttered. F.T. would always say that she was working on the clutter, but never fixed the problem. The manager became concerned for L.K. because once F.T. spent all day digging holes in the yard. At that time, L.K. was outside all day in the heat.

A Department investigator stated that she noticed the apartment contained a lot of boxes and toys "piled up," with one box on the floor containing a broken plate that was accessible to the child. One of the pictures admitted into evidence showed L.K. next to a pile of boxes or toys that was taller than the child. Dishes were "piled up" in the kitchen sink, trash was on the floor, and there was so much clutter that the investigator could not see the counter. One of the patrol officers stated that it was difficult to enter F.T.'s house because clothing, toys, and furniture were stacked up all over the living room, hallways, kitchen, and dining room. He did not believe the house was safe for a two year old child.

F.T.'s Department conservatorship worker stated that she developed a family service plan for F.T. She testified that F.T. lacked knowledge of child development and the parenting skills needed to meet L.K.'s developmental needs. According to the conservatorship worker, the Department's goals for F.T. included showing the ability to parent and protect L.K.,

demonstrating the ability to provide L.K. with adequate care and nutrients and to protect her from future abuse or neglect, and altering the behaviors that exposed L.K. to a risk of harm.

The conservatorship worker also testified that F.T.'s criminal trespassing behaviors seemed out of control and exposed L.K. to danger. She stated further that the conditions in F.T.'s home were unsanitary and hazardous. Ultimately, F.T. was evicted from her apartment. Since then, she has resided at several different places, but has consistently refused to give the Department an address. F.T was required to complete a psychological and psychiatric evaluation and follow all recommendations before she was allowed visitation with L.K. However, F.T. did not complete those evaluations, which included following all the recommendations, i.e., taking medications, until March 2013.

F.T. associated with known criminals and at one time was romantically involved with a man who has a lengthy criminal history that included burglary, multiple driving while intoxicated offenses, and possession of a controlled substance. She went to her older daughter's school even though she was not allowed to contact that child. As noted above, F.T. routinely entered residences that were not her own, was cited for criminal trespassing six times in approximately eight months, and displayed irrational behavior including eating dirt, as well as digging holes without any apparent reason. She did not timely complete a parenting course, failed to maintain contact with the Department after April 2013, and failed to obtain or maintain stable legal employment. C.W., F.T.'s older child, testified that in the summer of 2012, F.T. pushed her against the wall and attempted to choke her. According to C.W., F.T. hit her and L.K. for no reason. In contrast, a letter from the director of the Head Start program in Crockett stated that F.T. was dependable and resourceful as a community and parent volunteer.

F.T. also displayed unstable mental health, including significant and persistent delusions. When she was found in a closet, she told the investigator that she feared for her life and was hiding out in the former women's shelter. She explained that she had to hide in the woods because her sister had people chasing her, that she had insight, and that God put a spirit in her and that she knows how to undo the witchcraft spells that her sister casts on her. F.T. told her conservatorship worker that her "twin sister" was to blame for her unemployment because the sister persuaded Workforce Solutions to relocate so it would be harder for her to find employment.

When law enforcement found F.T. in a closet, L.K. was in a stroller. The officer who found her noticed that she had a "bunch" of mosquito or bug bites "peppered all up and down" her legs, as if she had been playing in an ant bed. The Department investigator examined L.K., who was approximately two years old at the time. She did not find any bruises, injuries, or malnutrition, but noticed that L.K. had red marks on her legs and scalp that appeared to be bites. L.K.'s first foster mother stated that L.K. was covered with sores and as a precaution, took her to the emergency room. L.K. suffered from ant, mosquito, and insect bites on her face, head, and body. She also had diaper rash and was dirty. The foster mother stated that L.K. was "very, very quiet," very scared of loud noises and people, and had speech problems. She stated that after speech therapy, L.K. "blossomed." However, the foster mother testified that L.K. had problems eating because she would eat dirt "quite a bit." The CASA volunteer stated that when he visited L.K., he noticed she was digging in the ground and eating dirt.

At one point, L.K. was moved to a foster-adopt home. L.K.'s current foster mother stated that L.K. is happy and doing very well. She stated further that when L.K. first arrived, she had a lot of fear including an extreme fear of doctor's and dentist's offices. She is still working on her fears although the foster mother reported that she had no anxiety during the last dentist visit. She has also learned to dress herself. L.K. was behind on her immunizations, but is now current. According to her foster mother, L.K. has bonded with her other children. The foster mother also stated that once she and L.K. saw F.T. at Wal-Mart, but L.K. did not recognize her mother, and F.T. did not appear to recognize L.K.

**Conclusion**

Viewing the evidence in the light most favorable to the finding, a reasonable fact finder could have concluded that F.T.'s housing was unsafe, that she did not have stable housing or employment, that she did not follow any of her physician's recommendations, that she engaged in criminal activity, and that she was mentally unstable. Considering all the evidence in relation to the best interest factors in the light most favorable to the court's finding, we conclude a reasonable trier of fact could have formed a firm belief or conviction that termination of F.T.'s parental rights was in the best interest of the child.

However, F.T. contended that L.K. was not hurt or malnourished. Although there is some evidence that L.K. did not sustain serious injuries while she was in F.T.'s care, this evidence is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of

its finding and formed a firm belief or conviction that terminating F.T.'s parental rights was in the best interest of the child.  Therefore, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of F.T.'s parental rights is in the best interest of the child.  Accordingly, we overrule F.T.'s seventh and eighth issues regarding the best interest of the child.

## DISPOSITION

Having overruled all of F.T.'s issues, we ***affirm*** the judgment of the trial court.

BRIAN HOYLE
Justice

Opinion delivered December 4, 2013.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(PUBLISH)

12



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**DECEMBER 4, 2013**

**NO. 12-13-00201-CV**

**IN THE INTEREST OF L. K., A CHILD**

Appeal from the 3rd District Court

of Houston County, Texas (Tr.Ct.No. 12-0129)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*